**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DANIEL TEITELBAUM,**

        **CASE NO. 2:17-CV-583**

    **Petitioner,**        **JUDGE MICHAEL H. WATSON**

        **Magistrate Judge Kimberly A. Jolson**

    **v.**

**NEIL TURNER, WARDEN,**

    **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court on the Petition (Doc. 1), Respondent's Return of Writ (Doc. 13), Petitioner's Reply (Doc. 15), and the exhibits of the parties.  For the reasons that follow, it is **RECOMMENDED** that the petition be **DENIED** and that this action be **DISMISSED**.

## I.    FACTS AND PROCEDURAL HISTORY

### A.  Facts, Trial, and Conviction

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of the case as follows:

> By indictment filed December 12, 2011, the state charged Teitelbaum with one count of aggravated burglary, in violation of R.C. 2911.11, a first-degree felony; two alternative counts of aggravated murder, in violation of R.C. 2903.01, unclassified felonies; and one count of tampering with evidence, in violation of R.C. 2921.12, a third-degree felony. Both aggravated murder charges carried death penalty specifications, and the aggravated burglary and aggravated murder charges all carried firearm specifications. All four charges in the indictment related to the shooting death of Paul Horn. Teitelbaum entered a plea of not guilty to all charges.
>
> A.  Evidence at Trial

At a jury trial commencing February 2014, Angela York, an officer with the Grove City Division of Police, testified that at 5:42 a.m. on March 11, 2011, she responded to a dispatch to 3574 Gateway Lakes Drive. Upon arrival, the door to the apartment was unlocked. When police pushed the door open further, they saw Horn's body just inside the door. By the time police were called to the scene, some of Horn's blood had already dried. There was also a salad scattered across the floor.

Dr. Jan Gorniak, then the Franklin County Coroner, testified that Horn died as a result of multiple gunshot wounds to the head and torso. Dr. Gorniak opined that the stippling around the entrance point of the fatal gunshot wound near the right ear indicated the gun had been no more than 6 to 12 inches away when it was fired.

Gary Wilgus of the Ohio Bureau of Criminal Identification and Investigation ("BCI") testified that he processed the crime scene at Horn's apartment. Based on the pools of blood around Horn's body and other blood found in the apartment, Wilgus estimated the blood had been left approximately 24 to 36 hours prior to his arrival at the scene. The locations of various blood stains in the apartment suggested the bloodletting began on the sofa and progressed toward the apartment's front door.

Wilgus testified he did not detect any sign of forced entry into Horn's apartment. Additionally, Wilgus did not see any indication that someone had searched or ransacked the apartment. Wilgus swabbed the inside and outside doorknobs of the apartment for touch DNA. Subsequent testing of the swabs by forensic scientist Emily Draper of the Miami Valley Regional Crime Laboratory revealed a mixture of DNA on the interior doorknob consistent with contributions from Horn, Teitelbaum, and Dennis Hopkins, Horn's roommate. The swab from the exterior doorknob contained a mixture of DNA consistent with Horn, Hopkins, and a third person. Based on the limited profile for the third person, Draper testified she could not rule out Teitelbaum as the third contributor.

Hopkins, Horn's roommate at the time of his death, testified that he worked for Horn at the Platinum Players Club and a second poker club. Hopkins said that on the afternoon of March 10, 2011, Horn told him to go get the game started at the second club. Hopkins testified he stayed at the second club until around midnight and then went to the Platinum Players Club to do some work in the kitchen. Around 4:15 a.m. on March 11, 2011, Hopkins said he left the Platinum Players Club to go home. When he got to the apartment, the front door was unlocked, which Hopkins said was not unusual. Upon opening the front door, Hopkins saw Horn's body on the ground and could tell Horn had been shot. Hopkins said his initial thought was Horn could have committed suicide.

Remembering he had two handguns in his duffel bag inside the apartment, Hopkins stepped around Horn's body, checked his bags to make sure the guns

were still inside, and took the duffel bag to his car. Hopkins testified he was inside the apartment for two or three minutes and said he did not disturb the body or anything else inside the apartment, other than his duffel bag, while he was there. Hopkins then drove back to the Platinum Players Club, without calling police, and attempted to give his bag with the guns to Minh Nguyen, who was managing the club that night. Nguyen refused to take the bag from Hopkins and told Hopkins to go back to the apartment and call police. Hopkins testified he drove back to the apartment, called 911, but did not reenter the apartment. When police arrived on the scene, Hopkins told them about moving the guns and continued to cooperate with police. Hopkins denied killing Horn.

Nguyen also testified, and he said he was at work at the Platinum Players Club on the evening of March 10, 2011. Nguyen testified that Horn came into the Platinum Players Club that evening and talked to Nguyen about his concerns regarding the deposition scheduled for the next day. Nguyen identified surveillance footage of the Platinum Players Club that showed Horn leaving the club at 7:46 p.m. Nguyen said he spoke to Horn on the phone a short time later, and phone records showed Horn made that phone call at 8:49 p.m.

Additionally, Nguyen testified that Hopkins came to the Platinum Players Club sometime before midnight on March 10, 2011 and stayed until 3:00 or 4:00 a.m. on March 11, 2011. After Hopkins left, Nguyen said Hopkins then returned around 4:30 or 5:00 a.m. to tell him that Horn was dead. Nguyen testified Hopkins asked him to take possession of some weapons, but Nguyen told him no and instructed Hopkins to go back to the apartment and call police.

A server at the Platinum Players Club, Kelsey Adkins, testified that she saw Horn at work on the evening of March 10, 2011. Adkins said she made Horn a salad and he left the Platinum Players Club with it at 7:46 p.m. Adkins further testified she saw Hopkins at the Platinum Players Club that evening, and he was still there when Adkins left work around 3:00 a.m.

William Newman, an employee at Horn's second poker club, the Celebrities Social Club, testified he received a phone call from Horn on the evening of March 10, 2011. Phone records indicated the phone call occurred at 8:58 p.m. and lasted a little more than six minutes.

Michael Anthony, an attorney who represented Horn in a commercial dispute against Teitelbaum ("the civil suit"), testified that Horn and Teitelbaum were partners in a poker business known as the Platinum Players Club. The documents from the civil suit showed Teitelbaum had sued Horn for breach of contract and breach of fiduciary duty. Teitelbaum alleged Horn had been stealing from the business. Pursuant to the partnership agreement for the Platinum Players Club, upon death of one of the partners, the survivor would have the option to buy out the decedent's interest or dissolve the business. As the civil suit progressed, the

parties scheduled Horn's deposition for March 11, 2011. Anthony testified he met with Horn on March 10, 2011 to prepare for the deposition.

Anthony further testified he was at his law office the next morning awaiting Horn's arrival when he received a phone call from the Grove City Division of Police informing him Horn had died. Anthony testified that police asked him not to disclose Horn's death. Though Teitelbaum's attorney in the civil suit called Anthony and contacted the assigned judge about possible sanctions for nonappearance, Anthony only indicated that Horn would not be appearing. Subsequently, Teitelbaum won a judgment giving him control of the Platinum Players Club due to Horn's death.

Adrian Wills, a friend of Teitelbaum's, testified he works in construction and photography but makes extra money by buying and selling items people might need, like rare art and books. According to Wills' testimony, he and Teitelbaum had been old friends who lost touch but eventually reconnected through Facebook in July 2010. Once they reconnected, Wills and Teitelbaum began communicating through email, Facebook, and Skype. Wills testified that at some point prior to March 2011, Teitelbaum asked him during a Skype call whether Wills would be able to obtain a gun for him. Teitelbaum told him he needed the gun for self-defense, and the two discussed types of guns. Wills testified he told Teitelbaum he thought he would be able to help him and even visited a firearms shop in Santa Fe to investigate. Ultimately, Wills said he reported back to Teitelbaum that he could not help him get a gun because of the prohibition against mailing firearms across state lines.

Wills testified that on March 12, 2011, the day after Horn's death, Wills was in a motorcycle accident and Teitelbaum came to visit him in Santa Fe while he was recovering. Wills testified that in his previous Skype conversations with Teitelbaum, he could see that Teitelbaum had a "mountain man" type of beard. (Tr. Vol. IX at 1737.)

However, when Teitelbaum arrived in Santa Fe, Wills said Teitelbaum was clean shaven.

Deborah Davis testified that she is Teitelbaum's ex-wife. In March 2011, both Davis and Teitelbaum lived in New Jersey. Davis testified that after their divorce, Teitelbaum bought a poker club but claimed it did not yield any income relevant to their ongoing child-support issues. Additionally, Davis said Teitelbaum claimed his inheritance from his mother was running out. Davis further testified that in the months leading up to March 2011, Teitelbaum's appearance had changed because he had started growing a beard a few months earlier. According to her testimony, Teitelbaum told Davis he liked the beard because people would not recognize him.

Davis testified she knew about the civil suit involving the poker club. She recalled having to switch visitation weekends with Teitelbaum in March 2011 because Teitelbaum had to be in Ohio for a deposition. Rather than having his scheduled visitation with his son over the weekend, Davis said Teitelbaum took their son out to dinner on a Thursday evening in March 2011 and said he was driving to Ohio after the dinner. When Davis next saw Teitelbaum on the Tuesday after the deposition date, he was clean shaven. Davis said she asked Teitelbaum about the deposition and he told her "it went well. It went really well." (Tr. Vol. X at 1915.) Once she learned the deposition never occurred and that Horn had been killed, Davis remembered thinking Teitelbaum's comment was inexplicable and shocking.

Horn lived at the Gateway Lakes apartment complex in Grove City. Daryl Cox, who lives at the dead end of Thrailkill Road in Grove City, testified that Thrailkill Road is very close to the Gateway Lakes apartment complex. According to his testimony, when Cox returned home from work on the evening of March 10, 2011, it was already dark outside. Cox said he saw a black car parked in a drainage ditch behind some bushes across the street from his house. Cox testified he thought it was "odd" to see a vehicle parked in that location when there is a designated parking area at the end of the road, and the presence of the car in that location made him "a little bit uncomfortable." (Tr. Vol. XII at 2381.) Cox checked the area around his house and around the car, but he did not see anyone in the vehicle at that time. When Cox left his house the next morning, the car was gone.

Detective Richard Forney of the Grove City Division of Police testified that during his investigation, he learned Teitelbaum had obtained two different lock picking kits in January 2011. He also identified a calendar kept by Grove City resident Jimmy Neace containing a notation that Teitelbaum stayed at Neace's home on the evening of March 10, 2011.

Daniel Sachs testified he is an employee of BrickHouse Security in New York City, a company that sells security and surveillance products. Sachs authenticated business records involving Teitelbaum, including a recorded phone call and an invoice. During the trial, the state played the recording of a phone call between Teitelbaum and BrickHouse Security from February 15, 2011. In the phone call, Teitelbaum inquires about obtaining a GPS tracking device called the "Spark Nano Real Time" device. Teitelbaum mentioned he lived in New Jersey, expressed an interest in a ten-day rental, and provided BrickHouse Security with his email address to facilitate a future rental.

Sachs then authenticated an email from BrickHouse Security to Teitelbaum sent on February 24, 2011, confirming Teitelbaum's rental of the GPS device for a ten-day period. Including the company's grace period for mailing the device, the rental end date was March 12, 2011. The fee for the rental of the GPS device was

$129.95, but BrickHouse Security also charged Teitelbaum an additional $100.00 when he failed to return the device and claimed he had lost it.

Phillip Loesch testified that from 2009 to 2012 he was an employee of Tracking the World, a company that provides GPS devices and software support. Loesch explained that when BrickHouse Security would sell or rent a GPS tracking device, BrickHouse contracted with Tracking the World to store the data obtained by the GPS device.

Detective Forney testified that he was able to obtain the GPS data from both Tracking the World and Brickhouse Security showing the tracking locations from the GPS device that Teitelbaum had rented. Based on the tracking locations from the GPS device, Forney said he then went to various locations along the tracking route to obtain surveillance footage. The surveillance footage he obtained showing a man who looked like Teitelbaum was consistent with the time stamp information contained in the GPS tracking data.

Robert Moledor, a detective with the Columbus Division of Police and FBI Task Force Officer, testified that he examined the GPS location data and the cell phone tower location data available from Teitelbaum's and Horn's phones. Detective Moledor testified that on March 9, 2011 at 3:10 p.m., the GPS unit traveled west from Margate City, New Jersey, arriving in the Columbus area around 1:40 p.m. on March 10, 2011. Detective Moledor testified that the cell tower data showing when Teitelbaum made phone calls was consistent with the GPS data.

Detective Moledor testified that the GPS unit was at Neace's residence on Clime Road at 6:15 p.m. on March 10, 2011. From there, the GPS unit traveled to the parking lot of the Gateway Lakes apartment complex at 6:30 p.m. Next, the GPS shows stops along various businesses on Stringtown Road. Detective Forney identified surveillance footage obtained from a White Castle restaurant on Stringtown Road. The surveillance footage showed a dark colored Toyota sedan pull into the White Castle parking lot, Teitelbaum exited the vehicle, went inside the White Castle, entered the restroom, then exited the restaurant and returned to his vehicle.

At 8:05 p.m. on March 10, 2011, the GPS unit arrived at the dead end of Thrailkill Road in Grove City, and it remained in that location until 9:20 p.m. Detective Moledor testified he went to this location on Thrailkill Road and that he was able to walk from the Gateway Lakes apartment complex to the dead end location on Thrailkill Road. Teitelbaum's cell phone records showed he made no phone calls during the time frame of 6:15 p.m. to 9:20 p.m. on March 10, 2011. Detective Moledor testified that the cell tower data for Horn's phone showed that at the time of the last phone call from Horn's phone at 8:58 p.m. on March 10, 2011, Horn was not yet back to his apartment but was very close, about four to seven minutes away.

Detective Moledor further testified that the GPS unit left the location at Thrailkill Road at 9:20 p.m. on March 10, 2011 and next traveled to the area of Waterford Tower condominiums in Columbus, stopping there for several minutes. The manager of the Waterford Tower, Mark Reader, testified regarding the surveillance system at the Waterford Tower. The surveillance footage from Waterford Tower on March 10, 2011 from the time frame of 9:38 p.m. to 10:10 p.m. showed a man walking from an area of parked cars to and from the direction of the nearby Main Street bridge in Columbus. The man had a beard and dark hair, and he was wearing blue jeans.

Detective Moledor testified that after leaving the area of the Waterford Tower, the GPS unit traveled to a Walmart store around 11:00 p.m. Surveillance footage obtained from the Walmart on Georgesville Road in Columbus showed Teitelbaum at 10:57 p.m. on March 10, 2011 wearing a dark-colored jacket, jeans, and dark-colored shoes. The surveillance video showed Teitelbaum purchase a jacket, shoes, jeans, and a pair of gloves, and he paid cash for the items. Additional surveillance footage showed Teitelbaum exit the store, walk to his car, then reenter the Walmart to purchase screws, again paying in cash. When Teitelbaum left the store for the second time, the surveillance footage showed him walk to his car, bend down in front of his vehicle, bend down at the rear of his vehicle, and then discard a white bag in a trash can before returning to his vehicle and driving away. Detective Moledor testified that the GPS unit then travelled from the Walmart back to Neace's home, arriving there around 11:40 p.m.

On the morning of March 11, 2011, the GPS unit left Neace's residence and traveled back to Margate City, New Jersey. Detective Forney also testified that a short time after arriving at Teitelbaum's address in Margate City, New Jersey, the GPS unit then sent pings from "a reef very close to [Teitelbaum's] residence out into the ocean." (Tr. Vol. XIV at 2967.)

Another old friend of Teitelbaum's, Colin Reedy, testified that he attended college with Teitelbaum but lost touch for several years after college. At the time of trial, Reedy was serving a four-year sentence in prison for having made a straw purchase of a gun for Teitelbaum in November 2010. Reedy testified pursuant to a cooperation agreement with the federal government and the state that he would provide information regarding Horn's murder.

Eventually, Reedy and Teitelbaum reconnected and would communicate primarily through email. When they first began corresponding, Reedy lived in Seattle, Washington and Teitelbaum lived in New Jersey. At first, Reedy said he had only "sporadic" contact with Teitelbaum, with months sometimes passing between emails. (Tr. Vol. XI at 2139.) Starting around 2009, the two began communicating more regularly and would occasionally send things like books, audio books, and movies to each other.

Reedy testified that the first time Teitelbaum mentioned his "business situation in Columbus" was October 2010. (Tr. Vol. XI at 2149.) Reedy said Teitelbaum told him that his partner was "swindling" him and had taken over $100,000 from Teitelbaum. (Tr. Vol. XI at 2150.)

When Teitelbaum began discussing the problems he was having with his business, Reedy and Teitelbaum would communicate using Skype video conferencing because Teitelbaum felt Skype was a "more secure way to communicate." (Tr. Vol. XI at 2152.)

Through their Skype conversations in October, November and December 2010, Reedy said Teitelbaum told him about the issues he was having with Horn, that Horn had locked Teitelbaum out of the Platinum Players Club, and that the lawsuit was dragging on slowly. Reedy testified that Teitelbaum mentioned the possibility of using a lock pick that he had obtained to try to get into either the poker club or Horn's apartment. As they had more conversations, Reedy said Teitelbaum went from wanting to get surveillance and information on Horn to wanting to "get[ ] rid of" Horn. (Tr. Vol. XI at 2159.)

Teitelbaum told Reedy that the Platinum Players Club would revert to Teitelbaum if Horn were dead.

Reedy testified that Teitelbaum told him he would sometimes follow Horn to his apartment or the club, and that Teitelbaum discussed the times of day when he knew Horn would be at his apartment. Additionally, Reedy said Teitelbaum showed him a map via Skype of Horn's apartment complex, pointing out Horn's apartment and pointing out a nearby road that Teitelbaum "thought was a good place to park a car and then walk * * * to the apartment complex." (Tr. Vol. XI at 2163.) Reedy said Teitelbaum discussed whether he should wait either in a car or outside hallway of the apartment complex or whether he should use a lock pick and wait inside Horn's apartment.

As the discussions progressed, Reedy said Teitelbaum asked him to help kill Horn. Reedy said Teitelbaum told him he had talked to someone in Santa Fe about helping him kill Horn but Teitelbaum decided "it wasn't going to be an option." (Tr. Vol. XI at 2179.) Reedy testified he suggested to Teitelbaum a sum of $20,000 upfront plus an additional $1,000 per month for an unspecified period of time. Reedy said he ultimately said no to the idea of killing Horn for money.

However, Reedy did help Teitelbaum obtain a gun. He testified that on November 17, 2010, he purchased a semi-automatic Kel–Tec p–11 9 mm handgun at a Seattle gun store and registered it to his name. After a mandatory waiting period, Reedy returned to the gun store to take possession of the gun on November 27, 2010. Reedy testified that a short time later, he sent the gun from a UPS office in Seattle to Teitelbaum in New Jersey. A security representative for UPS identified UPS records showing delivery of the package to Teitelbaum's address in Margate,

City New Jersey on December 3, 2010. By check dated January 2, 2011, Teitelbaum paid Reedy $400 for the gun, ammunition, and the cost of shipping. In these Skype conversations, Reedy said Teitelbaum had a "full beard." (Tr. Vol. XI at 2236.)

Though Reedy testified that many of his conversations with Teitelbaum were via Skype, Reedy also identified printed emails he sent to Teitelbaum. In one email that Reedy sent in either October or November 2010, Reedy wrote that the gun should be either a .38 handgun or a 9 mm handgun, and he mentioned the need to factor in the mandatory waiting period before he could obtain the gun. Reedy also inquired in the email whether Teitelbaum still wanted Reedy to "take care of it" or whether Teitelbaum had decided to do it himself. (Tr. Vol. XI at 2222.) Reedy testified this was an indirect discussion regarding who should kill Horn.

Reedy identified another email dated November 12, 2010 in which he wrote to Teitelbaum that he had a second option for a gun and indicated he did not think only $10,000 upfront was enough money for Reedy to "do it." (Tr. Vol. XI at 2228.) Reedy wrote that he would ask for $20,000 upfront plus an additional $1,000 per month, and he again suggested that Teitelbaum was "the best person to do it based on knowledge, timing and money available." (Tr. Vol. XI at 2229.) Teitelbaum sent a reply email writing only "[l]et's Skype this morning." (Tr. Vol. XI at 2232.) In a third email Reedy identified, Reedy wrote to Teitelbaum and referenced their "scheming" about "ending * * * a life." (Tr. Vol. XI at 2234.)

Reedy testified that in January 2011, he left the country to go on a backpacking trip around the world, and he did not return to the United States until October 2011. The stamps on his passport showed he was in Indonesia, Thailand and Laos in March and April 2011. He was still overseas in August 2011 when the Federal Bureau of Investigation ("FBI") contacted him to discuss whether he had any information regarding Horn's murder. Reedy testified he contacted Teitelbaum via Skype to let Teitelbaum know that the FBI had contacted him. Reedy said Teitelbaum told him that the FBI searched his apartment and seized his computer and some other items. Reedy said Teitelbaum also indicated to him that the gun was in a river.

In September 2011, Reedy said Teitelbaum came to visit him in Vietnam, and Teitelbaum no longer had a beard. Reedy said they discussed Horn's murder and that Teitelbaum again told him he threw the gun in a river. Reedy told Teitelbaum he thought he might need a lawyer, Reedy said Teitelbaum agreed to give him $1,500 to pay an attorney. Reedy testified that he told Teitelbaum he intended to talk to the police and that Teitelbaum told him "just don't say anything." (Tr. Vol. XI at 2285.)

Reedy testified that on November 28, 2011, he met with police and FBI in Columbus, Ohio. During a break from his interviews, Reedy left the room and wrote in a text message that his attorney was negotiating with the prosecutors and

police. Reedy said he intended to send that text message to his girlfriend but mistakenly sent it to Teitelbaum instead. When Reedy told his attorney of his mistake, his attorney and the law enforcement officers took a photograph of the text message and told Reedy to send another message to Teitelbaum saying "just kidding." (Tr. Vol. XI at 2288.) Teitelbaum did not respond to these text messages. The FBI seized Teitelbaum's phone when it searched his residence on May 5, 2011, but Teitelbaum could still monitor text messages by other means.

James Smith, a forensic scientist with BCI, testified that the bullets fired at Horn were all fired from the same gun, and the five casings found at Horn's apartment were all fired by the same gun. Smith testified the bullets were all 9 mm and were fired from a barrel with characteristics that are consistent with the gun Reedy purchased and sent to Teitelbaum. Additionally, Smith testified his testing excluded both Hopkins' 9 mm gun and another 9 mm weapon used by another Platinum Players Club employee as the weapon that could have fired the bullets.

Special Agent Kristin Cadieux of the FBI testified she was involved in obtaining search warrants for Teitelbaum's residence in New Jersey and his 2006 Toyota Avalon. Among the items seized in the execution of the search warrants was Teitelbaum's personal journal.

Davis, Teitelbaum's ex-wife, also testified she knew that Teitelbaum kept a journal in a spiral notebook, and she identified such a notebook that the FBI had seized from his home as containing Teitelbaum's handwriting.

Special Agent Cadieux read various entries from Teitelbaum's journal. In an entry dated May 4, 2010, Teitelbaum wrote he had made big mistakes in his life, including "pick[ing] a horrible, horrible business partner." (Tr. Vol. XII at 2602.) In an entry dated May 29, 2010, Teitelbaum wrote about Horn trying to "rob [him] blind," and further wrote "[o]ne of the worst aspects of the whole debacle has been the thought of [Horn] running around the club telling everyone how all this is my fault and basically parading round like he owns the club and I'm an idiot." (Tr. Vol. XII at 2602.) Teitelbaum also expressed frustration in the journal entries with the slow pace of the litigation with Horn, writing on November 26, 2010 "[t]he American legal system is a joke and cannot be relied upon to deliver justice." (Tr. Vol. XII at 2611.)

In October of 2010, Teitelbaum wrote he could not "get Ohio out of [his] mind lately * * * it's getting bad." (Tr. Vol. XII at 2605.) He then wrote of his need to "do something and soon." (Tr. Vol. XII at 2606.) Teitelbaum also wrote in some entries about his need to contact Wills and Reedy, and he later wrote about having spoken to Wills.

Though his entries never explicitly mentioned a plan to kill Horn, Teitelbaum described the dark clothing he would wear when he "do[es] it." (Tr. Vol. XII at 2606.) He also expressed some doubts about whether he was "the man for the

job," and wrote he "need[ed] more training." (Tr. Vol. XII at 2614.) On January 25, 2011, he wrote he "really would benefit from borrowing a car," but wrote his brother would not lend him one. (Tr. Vol. XII at 2615.) On February 19, 2011, he wrote that "[t]here is something on [his] mind all the time, and [he does not] want to write about it," but he "need[s] to do this job." (Tr. Vol. XII at 2616.)

Special Agent Cadieux testified there were no journal entries on the date of Horn's death. However, on August 10, 2011, five months after Horn's death, Teitelbaum wrote as his last entry in the journal "I'm alive! Happy to be alive. Jacob is alive. Deb is alive. Joanne is alive. Nick Enright is alive. Paul Horn is dead." (Tr. Vol. XII at 2619.) Teitelbaum further wrote in that last entry he was drinking coffee, had plans to see his son, plans with his girlfriend, and that "[s]ure beats being dead or in prison," stating he should turn his life story into a book. (Tr. Vol. XII at 2619.) He wrote his "depression seems totally lifted." (Tr. Vol. XII at 2620.)

Officer John Gagnon of the Columbus Division of Police testified that both the Columbus Police and the FBI searched the Scioto River in downtown Columbus in the area around the Main Street bridge. Officer Gagnon testified neither the Columbus Division of Police nor the FBI ever recovered a gun from the river, but he described that particular area of the river as a difficult and dangerous area to search. Officer Gagnon said that in the time frame of March 9 to 11, 2011, the river was moving at a "rapids" rate. (Tr. Vol. XII at 2437.)

Jerry Eagan, a United States Customs and Border Protection Officer, testified that he worked the border post at the Lewiston–Queenston Bridge in the area of Buffalo and Niagara Falls, New York from 2010 to 2013. Eagan identified records showing Teitelbaum came back into the United States from Canada alone in his car on November 28, 2011. The records indicated a "Canadian refusal," meaning Teitelbaum had attempted to enter Canada but had been refused and sent back to the United States. (Tr. Vol. X at 1978.)

A. Jury Instructions and Deliberations

During jury instructions, the trial court paused in the middle of its instruction regarding alternate jurors and engaged in some discussion with counsel off the record. Following that discussion, the trial court stated:

I had a question about this next instruction, and counsel all agree it is appropriate * * *.

The alternates—when you retire to the jury room, the 12 regular jurors will select a foreperson. So the two alternates will not participate in that process. The alternates should listen to the deliberations but must not participate in the deliberations, unless, until, if ever, they are called upon to serve as a regular juror.

Alternate jurors were selected to serve in the event of any misfortune befalling a member of the panel. As yet that has fortunately not occurred. Nonetheless, your presence is still required while this jury is deliberating.

(Tr. Vol. XVII at 3462–63.) The jury then retired to deliberate and the alternate jurors went into the jury room with the regular jurors.

Shortly after the jury began deliberating, the bailiff notified the trial court of two questions from the jury. The second question was from an individual juror and read "Can a juror be removed for stating he shouldn't have been picked and he has trouble and doesn't like considering circumstantial evidence?" (Tr. Vol. XVII at 3466.) Counsel for both parties agreed to the trial court's response of "The court has received a question from an individual juror. The court may not answer questions like this in the future. While an individual may ask a question, it must come from the entire panel." (Tr. Vol. XVII at 3466–67.)

Approximately one hour later, the trial court received another question from the jury. Thereafter, the following exchange occurred:

THE COURT: For the record court has received another question:

"Can [alternate juror No. 1] be accused"—I assume it means recused—"from the jury because its to [sic] hard for him to listen in without commenting or putting in his two sense."

As a way of background, I believe this question is the result of the last question from the jury where I indicated—please be seated—where I said to the jury the question has to come from the panel.

Again for the record since that time, [alternate juror No. 1] did approach my bailiff expressing his problem with sitting there not participating. Is that correct, Cheryl?

THE BAILIFF: That's correct.

THE COURT: She asked me what to do. I told him—I told her to go and simply tell him that the instructions were that he could not participate. I asked that she communicate that information. I asked Lynn to go with her so that there would be a witness to that.

And I believe that was the information you gave; is that correct?

THE BAILIFF: Yes.

THE COURT: And you were there, Lynn?

MS. HARDESTY: Uh-huh.

THE COURT: And he expressed some difficulty at that time?

THE BAILIFF: Yes.

THE COURT: So we're now back with that question. We do have a juror that's I think problematic. However, with the agreement of counsel, I will bring [alternate juror No. 1] back in and express to him the importance of being an alternate, how important an alternate is to making sure that we have a full jury, how he said he would follow the law, and see if we can't agree on to get him to participate by sitting there.

(Tr. Vol. XVII at 3468–70.) Neither party objected to the trial court's proposed plan to speak to the alternate juror.

At that time, the trial court called the alternate juror, ("alternate juror No. 1"), into the courtroom. The trial court first confirmed that alternate juror No. 1 was the one who submitted the earlier question coming from an individual rather than the whole panel regarding difficulty considering circumstantial evidence. Alternate juror No. 1 stated he thought the alternates "would be away from the deliberation part," and "didn't realize that, you know, sitting there not being able to say anything would trigger my anxiety." (Tr. Vol. XVII at 3473–74.) After some more discussion, alternate juror No. 1 agreed to return to the jury room and obey the instruction not to participate.

The next morning, the jury resumed deliberations. The trial court then had the following discussion with counsel:

THE COURT: It's been brought to my attention—and I raised the issue about whether or not the alternates should be back with the jury. Both sides approached the bench at my request, and both sides agreed that the alternates should go back with a limited instruction.

Is that correct on behalf of the state?

MS. FARBACHER: Yes, Your Honor.

THE COURT: Is that correct on behalf of defense?

MR. NEMANN: Yes, Your Honor.

THE COURT: Since that time, it's come to everyone's attention that I was right, that the alternates should not be back there.

And that's not the issue; it's how to remedy the issue. The suggestion is that we bring the jury back, advise them that the alternates should not have been back, sequester the alternates separately, and tell the jury to continue deliberations; start their deliberations over with the same instructions.

(Tr. Vol. XVII at 3477–78.) After allowing defense counsel time to confer with his client, both parties agreed to the trial court's proposed approach of separately sequestering the alternate jurors and instructing the jury to begin its deliberations anew. The trial court then called the jury back into the courtroom and stated:

When we gave you our final instructions, there was some discussion—I know you were aware of it at the bench—as to whether or not the alternates should be back during deliberations. And it was determined by counsel that you should be.

With those limitations we have all agreed that you should not be back there during those deliberations. You will be sequestered. You will still spend the night and do everything else. But you will remain separate from the rest of the panel.

Cheryl will take you. You're welcome when you are in that room to talk with each other, to read, to visit, to do anything you want other than—you know what's coming next—discuss this case.

To the rest of you, you are to continue. Start your deliberations over subject to the same instructions that I gave you, okay, how long it takes to get back to where you are now but to refocus yourself and start over. With that instruction I apologize for any inconvenience.

(Tr. Vol. XVII at 3480–81.) The jury then resumed its deliberations without the alternate jurors present.

Approximately 50 minutes later, the jury notified the trial court it had reached a verdict. The jury returned guilty verdicts as to all counts and specifications.

On March 17, 2014, prior to the mitigation phase of sentencing, Teitelbaum filed a motion for a mistrial. Teitelbaum's stated reasons for seeking a new trial were an alleged violation of then-current R.C. 2313.37(C) from the trial court allowing the alternate jurors to be present in the jury room during a portion of deliberations. The trial court construed the motion as a post-trial motion for new trial pursuant to Crim.R. 33. Though acknowledging it was error to allow the alternate jurors to be present in the jury room during deliberations, the trial court nonetheless denied Teitelbaum's motion for new trial, concluding Teitelbaum was unable to demonstrate plain error from the trial court's error. Additionally, the trial court concluded any error from the presence of the alternate jurors during deliberations was invited error.

Prior to commencing the sentencing phase, the trial court dismissed alternate juror No. 1 from further participation in the case after alternate juror No. 1 presented a doctor's note detailing his anxiety from being sequestered.

A. Penalty Phase

On March 21, 2014, the case proceeded to the penalty phase on the aggravated murder counts. During an initial discussion about the jury instructions, the court stated it intended to instruct the jury that "the defendant does not have any burden of proof" and that "the aggravated murder itself is not an aggravating circumstance." (Tr. Vol. XVIII at 3504, 3508.) The state objected to both instructions. The court overruled the state's objections.

In the preliminary penalty phase instructions, the court instructed the jury:

In this case the aggravating circumstance is precisely that set out in your verdict on Specification One to Counts Two and Three of the indictment.

It is as follows: That the defendant purposely caused the death of Paul Horn while committing or attempting to commit or fleeing immediately after committing or attempting to commit aggravated burglary, and the defendant personally committed each act which constituted the aggravated murder.

This aggravating circumstance was proven in the trial phase, and it is not necessary for the State of Ohio to present further evidence to you regarding this aggravating circumstance.

However, only this aggravating circumstance may be considered by you during the sentencing proceeding. The aggravated murder itself is not an aggravating circumstance. Because you found that an aggravating circumstance is present, the law provides the following four sentencing options for your consideration:

(A) life imprisonment without parole eligibility for 25 full years;

(B) life imprisonment without parole eligibility for 30 full years;

(C) life imprisonment without the possibility of parole;

(D) death.

You are here today to consider which of these sentences to impose. The aggravating circumstance will be weighed against the mitigating factors that have been or will be presented.

Mitigating factors are factors about an individual or an offense that weigh in favor of a decision that a life sentence rather than a death sentence is appropriate.

In order for you to decide that the sentence of death shall be imposed upon Daniel Teitelbaum, the State of Ohio must prove beyond a reasonable doubt that the aggravating circumstance of which the defendant was found guilty is sufficient to outweigh the factors in mitigation of imposing the death sentence. The defendant does not have any burden of proof.

(Tr. Vol. XVIII at 3542–44.)

The state did not present any witnesses during the penalty phase. Teitelbaum called several witnesses in mitigation. In the final penalty phase instructions, the court instructed the jury as follows:

In order for you to decide the sentence of death shall be imposed upon Daniel Teitelbaum, the State of Ohio must prove beyond a reasonable doubt that the aggravating circumstances of which the defendant was found guilty is sufficient to outweigh the factors in mitigation of imposing the death sentence.

The defendant does not have any burden of proof. Reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced that the aggravating circumstance of which the defendant was found guilty outweighs the mitigating factors.

* * *

The aggravating circumstance that you shall consider as to Count Two is that the defendant purposely caused the death of Paul Horn while committing or attempting to commit or fleeing immediately after committing or attempting to commit aggravated burglary, and the defendant was personally committed—and the defendant personally committed each act which constituted the aggravated murder.

The aggravating circumstance you shall consider as to Count Three is that the defendant purposely caused the death of Paul Horn while committing or attempting to commit or fleeing immediately after committing or attempting to commit aggravated burglary, and the defendant personally committed each act which constituted the aggravated murder.

The aggravated murder itself is not an aggravating circumstance. You may only consider the aggravating circumstance that was just described to you and which accompanied the aggravated murder.

(Tr. Vol. XVIII at 3704–07.)

Following the mitigation hearing on the capital specification, the jury was unable to agree on whether aggravating circumstances outweighed mitigating factors

beyond a reasonable doubt. The jury unanimously found that the court should impose a sentence of life without the possibility of parole.

The trial court conducted a sentencing hearing on March 31, 2014 and imposed a sentence of life without the possibility of parole on the aggravated murder charge in Count Two of the indictment to be served concurrent with a six-year sentence on the aggravated burglary charge and a one-year sentence on the tampering with evidence charge. The trial court further found the aggravated murder charge in Count Three merged with the aggravated murder charge in Count Two of the indictment. Additionally, the trial court imposed consecutive three-year terms for the firearm specifications attached to Counts One and Two. The court journalized Teitelbaum's convictions and sentence in an April 4, 2014 judgment entry. Teitelbaum timely appeals. The state sought leave to file a cross-appeal, which this court granted.

(Doc. 12-2, PAGEID #: 724–43, *State v. Teitelbaum*, 67 N.E.3d 85, 91–103 (Ohio 10th Dist. 2016)) (paragraph symbols omitted).

## B. Direct Appeal

On April 16, 2014, Petitioner, through counsel, filed a notice of appeal, raising nine assignments of error:

[1.] The presence and participation of an alternate juror during deliberations violated Appellant's right to a jury trial as guaranteed by Section 5, Article I, of the Ohio Constitution and the Fifth and Fourteenth Amendments to the United States Constitution.

[2.] The trial court erred by failing to take steps necessary to correct the error arising from the presence and participation of alternate jurors in deliberations.

[3.] The trial court erred by denying Appellant's motion for mistrial (new trial) when the presence and participation of an alternate juror in deliberations violated his constitutional right to a jury trial.

[4.] The trial court's erroneous, inconsistent, and contradictory evidentiary rulings constituted an abuse of discretion and violated Appellant's constitutional right to a fair trial.

[5.] The trial court erred by failing to record all sidebar conferences as required by Crim.R. 22.

[6.] Appellant's conviction and sentence are void because his right to a unanimous jury verdict under Crim.R. 31(A) was violated by the court's failure to properly instruct the jury.

[7.] Defendant–Appellant was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.

[8.] Appellant's convictions are against the manifest weight of the evidence.

[9.] The cumulative effect of the errors advanced in this brief resulted [in] a violation of Appellant's right to a fair trial and thus entitles him to a new trial.

(Doc. 12-1, PAGEID #: 346; *see also* Doc. 12-2, at PAGEID #: 743–44). On June 21, 2016, the appellate court overruled Petitioner's nine assignments of error, as well as the state's two cross-assignments of error, and affirmed the judgment of the trial court. (Doc. 12-2, PAGEID #: 743).

On October 4, 2016, Petitioner, proceeding *pro* se, filed a timely notice of appeal to the Supreme Court of Ohio. (Doc. 12-2, PAGEID #: 797). On December 14, 2016, the Ohio Supreme Court declined to accept jurisdiction of the appeal. (Doc. 12-2, PAGEID #: 884, *State v. Teitelbaum*, 147 Ohio St.3d 1458 (2016)).

### C. Post-Conviction Petition and Collateral Relief

Meanwhile, on July 16, 2015, Petitioner filed a *pro se* post-conviction petition in the state trial court, raising seven claims related to ineffective assistance of counsel, as well as violations of his rights under the Fourteenth Amendment. (Doc. 12-2, PAGEID #: 885). On March 21, 2016, the trial court denied the post-conviction petition. (Doc. 12-3, PAGEID #: 1014). Petitioner failed to file a timely appeal. Instead, Petitioner moved to file a delayed appeal on February 1, 2017, March 2, 2017, and March 28, 2017 (PAGEID #: 1020, 1025, 1041); however, the appellate court denied those motions. (PAGEID #: 1023, 1029, 1045).

On July 28, 2016, Petitioner filed an application to reopen his direct appeal pursuant to Ohio Appellate Rule 26(B), claiming that his appellate counsel was ineffective for a variety of

reasons. (Doc. 12-3, PAGEID #: 1047). On September 1, 2016, the appellate court denied the Rule 26(B) application. (Doc. 12-2, PAGEID #: 788). Petitioner did not file an appeal to the Ohio Supreme Court.

### D. Federal Habeas Corpus

On June 19, 2017, Petitioner filed the *pro se* petition for a writ of habeas corpus currently at issue before this Court. (Doc. 1). He raises fifty claims for relief, summarized as follows: Petitioner asserts that he is actually innocent and that his convictions constitute a manifest miscarriage of justice (claim one); that he was denied the right to the effective assistance of trial counsel because his attorney failed to develop arguments regarding the time of death or properly instruct the jury on the time of death (claims two and three); that he was denied the effective assistance of appellate counsel (claim four); that the evidence is constitutionally insufficient to sustain his conviction on aggravated murder (claim five); that he was denied a unanimous jury verdict, and that his convictions thereby violate the Eighth Amendment (claims six and seven); that trial court unconstitutionally instructed the jury that they could not consider punishment, and violated Ohio law by failing to instruct the jury on the range of punishments (claims eight and nine); that he was denied the effective assistance of counsel because his attorney failed to prepare or speak coherently in front of the jury, and failed to object to death penalty jury instructions (claims ten and eleven); that he was denied a fair trial because the prosecutor equated reasonable doubt with the decision to ride an elevator in a public building, and denied the effective assistance of trial counsel because his attorney failed to object (claims twelve and thirteen); that he was denied a fair trial because the prosecutor told the jury to give circumstantial evidence the same weight as direct evidence, and denied the effective assistance of counsel because his attorney failed to object (claims fourteen and fifteen); that he was denied a fair trial

based on prosecutorial misconduct due to improper statements regarding e-mails in opening argument (claim sixteen); that he was denied a fair trial because the State failed to timely provide original printouts of e-mails (claim seventeen); that he was denied the effective assistance of counsel when his attorney failed to move for a mistrial based on the inadmissibility of e-mail evidence (claim eighteen); that the trial court unconstitutionally *sua sponte* changed its ruling on the admissibility of e-mails (claim nineteen); that the trial court abused its discretion in ruling on the admissibility of e-mail evidence without examining original documents (claim twenty); that he was denied a fair trial because prosecution witness Colin Reedy failed to authenticate certain e-mail exhibits (claim twenty-one); that he was denied the effective assistance of counsel because his attorney claimed that e-mails were original (claim twenty-two); that the search of his computers and e-mail accounts violated the Fourth Amendment (claim twenty-three); that he was denied the effective assistance of counsel because his attorney failed to file a motion to suppress e-mail evidence (claim twenty-four); that his convictions on aggravated burglary and aggravated murder violate the Double Jeopardy Clause (claim twenty-five); that he was denied a fair trial because the State failed to provide a Bill of Particulars (claim twenty-six); that he was denied a fair trial by the presence of alternate jurors during deliberations (claim twenty-seven); that the trial court abused its discretion and denied him a fair trial when it refused to permit defense counsel to *voir dire* alternate juror Tracy Clifton (claim twenty-eight); that the trial court improperly denied his motion for a new trial based on falsehoods regarding the record (claim twenty-nine); that a defective Indictment  unconstitutionally denied him adequate notice of the charges, and he was  denied the effective assistance of trial and appellate counsel when his attorneys failed to raise the issue (claims thirty and thirty-one); that the Indictment unconstitutionally failed to specify a predicate aggravating offense for the charge of burglary in

Count One (claim thirty-two); that the appellate court unconstitutionally required him to establish prejudice on his claim of the denial of the effective assistance of counsel (claim thirty-three); that the trial court issued a confusing jury instruction on reasonable doubt that was biased in favor of the prosecution (claim thirty-four); that the trial court unconstitutionally instructed the jury on the stacking of inferences (claim thirty-five); that the jury's guilty verdict on Count Four, which charged him with tampering with evidence, required an unconstitutional stacking of inferences (claim thirty-six); that he was denied his right to the effective assistance of counsel due to his attorney's instruction to the jury on multiple inferences (claim thirty-seven); that he was denied a fair trial because the State failed to introduce evidence that he had rented cars while in Columbus, as indicated by the prosecutor during opening statement (claim thirty-eight); that the prosecutor improperly bolstered the credibility of a prosecution witness Colin Reedy (claim thirty-nine); that testimony of the prosecution's DNA expert was unreliable, and Petitioner is the victim of a manifest miscarriage of justice based on newly discovered evidence regarding flaws in the FBI's DNA database (claim forty); that the prosecution presented false testimony regarding text messages that had purportedly been sent to the Petitioner (claim forty-one); that he was denied the right to the effective assistance of trial counsel based on his attorney's failure to examine certain telephone records (claim forty-two); that he was denied a fair trial due to prosecutorial misconduct based on the knowing presentation of false evidence, *i.e.*, Reedy's testimony that he sent a "Just Kidding" text message to the Petitioner (claim forty-three); that the trial court unconstitutionally instructed the jury to "keep their thumb off the scale" (claim forty-four); that the cumulative effect of erroneous and confusing jury instructions constituted structural error, denying Petitioner a fair trial (claim forty-five); that he was denied the effective assistance of counsel because his attorney colluded with the prosecutor (claim forty-six); that he

was denied the effective assistance of counsel due to his attorney's "excessive obsequiousness to State prosecutors" (claim forty-seven); that he was denied the effective assistance of counsel because his attorney repeatedly suggested that Petitioner was guilty (claim forty-eight); that he was denied the effective assistance of counsel based on the cumulative error and failure to prepare (claim forty-nine); and that he was denied the effective assistance of appellate counsel because his attorney failed to challenge jury instructions prohibiting consideration of punishment (claim fifty). (Doc. 1, at PAGEID #: 8–57).

Respondent argues that Petitioner's fifty claims are either procedurally defaulted or without merit. (*See generally* Doc. 13).

## II.    PROCEDURAL DEFAULT

### A.  Standard

Congress has provided that state prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of habeas corpus. 28 U.S.C. § 2254(a). A petitioner must overcome several procedural barriers, however, "before a federal habeas court will review the merits of a petition for a writ of federal habeas corpus." *Smith v. Gansheimer*, No. 508CV2805, 2010 WL 3894030, at *7 (N.D. Ohio Aug. 31, 2010), *adopted by*, No. 508CV2805, 2010 WL 3894025 (N.D. Ohio Sept. 27, 2010). One such procedural barrier requires a state criminal defendant with federal constitutional claims to present those claims to the state courts for consideration, before raising them in federal court. *See* 28 U.S.C. § 2254(b), (c). Indeed, "[w]hen a habeas petitioner fails to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available or due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally

defaulted and may not be considered by the federal court on habeas review." *Seymour v. Walker*, 224 F.3d 542, 549–50 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84–87 (1977); *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)).

Put another way, a claim may become procedurally defaulted in two ways. "First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court." *Smith v. Gansheimer*, No. 508CV2805, 2010 WL 3894030, at *7 (N.D. Ohio Aug. 31, 2010), *adopted by*, No. 508CV2805, 2010 WL 3894025 (N.D. Ohio Sept. 27, 2010) (citing *Coleman v. Thompson*, 501 U.S. 722, 748 (1991)). In this instance, courts follow the four-prong test set out in *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), to determine whether a petitioner's failure to observe such state procedural rule constitutes procedural default:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." [*Maupin*, 785 F.2d] at 138 (citations omitted). "Second, the court must decide whether the state courts actually enforced the state procedural sanction." *Id.* (citations omitted); *see also Coleman v. Thompson*, 501 U.S. 722, 729–30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Third, the state procedural forfeiture must be an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. *Maupin*, 785 F.2d at 138. Finally, if these three prerequisites are met, "the petitioner must demonstrate under *Sykes* that there was 'cause' for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Id.* (citing in part *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)).

*Scuba v. Brigano*, 259 F. App'x 713, 718 (6th Cir. 2007). In other words, the fourth prong makes clear that a petitioner can overcome procedural default by showing cause and prejudice. Cause under this test "must be something external to the petitioner, something that cannot fairly be attributed to him [, *i.e.*,] . . . some factor external to the defense [that] impeded [ ] efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753. Of note, this "cause and

prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level and to the failure to appeal at all. *Id.* at 750.

Petitioner may also procedurally default a claim by failing to raise it in state court and pursue it through the state's "ordinary appellate review procedures." *Id.* (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)). One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) ("The federal courts do not have jurisdiction to consider a claim in a habeas petition that was not "fairly presented" to the state courts.") (citing *Franklin v. Rose*, 811 F.2d 322, 324–25 (6th Cir. 1987)); *see also Wright v. Lazaroff*, 643 F. Supp. 2d 971, 985 (S.D. Ohio 2009) ("A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.").

Importantly, even if a petitioner's claim is procedurally defaulted, he may nonetheless obtain review of his claims if he can demonstrate that a court's refusal to consider a claim would result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *see also Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (holding that if a claim is procedurally defaulted, it must not be considered unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent.") (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)). The fundamental miscarriage of justice exception requires a showing that, "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

**B. Application**

The undersigned concludes that Petitioner has procedurally defaulted all of the claims he now presents for relief, with the exception of claims 2, 3, 19–21, and 24.

*1. Failure to Raise Claims on Direct Appeal (Claims 1, 7–18, 22, 23, 25, 26, 28–32, 34–39, 41, and 43–49)*

Petitioner failed to raise most of his instant claims on direct appeal, where he was represented by new counsel. It is well-settled that "[c]laims appearing on the face of the record must be raised on direct appeal, or they will be waived under Ohio's doctrine of *res judicata*." *Hill v. Mitchell*, No. 1:98-CV-452, 2006 WL 2807017, at *43 (S.D. Ohio Sept. 27, 2006) (citing *State v. Perry*, 10 Ohio St.2d 175 (1967)). Claims 1, 7–18,[1] 22, 23, 25, 26, 28–32,[2] 34–39, 41, and 43–49 all appear on the face of the record, but were not raised on direct appeal. (*See generally* Doc. 1). Thus, Petitioner violated the *res judicata* rule set forth in *Perry* when he failed to raise those claims on direct appeal, and consequently satisfied the first prong of the *Maupin* test.

Petitioner did raise claims 8, 25, and 28 on appeal to the Ohio Supreme Court. (Doc. 12-2, PAGEID #: 800.) However, the Ohio Supreme Court does not ordinarily consider claims that were not raised in the appellate court below, and Petitioner did not thereby preserve these claims for review in these proceedings. *See Jones v. Warden, Lebanon Corr. Inst.*, No. 2:14-cv-01218, 2015 WL 7829145, at *1 (S.D. Ohio Dec. 4, 2015) (citing *Brown v. Voorhies*, 2:07-cv-00014,

---

[1] It is the position of the Respondent that Petitioner has procedurally defaulted claim 18, in which Petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to move for a mistrial based on the inadmissibility of e-mail evidence, by failing to raise it in the Ohio Supreme Court. (Doc. 13, PAGEID #: 1222). However, the record also reflects that Petitioner has waived this claim by failing to raise it in the Ohio Court of Appeals. (*See* Doc. 12-1, PAGEID #: 409–21).

[2] In claim 29, Petitioner asserts that the trial court "abused its discretion" in denying his motion for a new trial on the basis of falsehoods, thereby denying him due process. (Doc. 1-1, PAGEID #: 158–61). Again, the record reflects that Petitioner failed to raise this same issue on direct appeal. (*See* Doc. 12-1, PAGEID #: 395–96).

2009 WL 187830, at *8 (S.D. Ohio Jan. 26, 2009) (claim waived by failure to present it to the

Ohio Court of Appeals) (citing *Mitts v. Bagley*, 2005 WL 2416929 (N.D. Ohio Sept. 29, 2005)

(citing *Fornash v. Marshall*, 686 F.2d 1179, 1185 n. 7 (6th Cir. 1982) (citing *State v. Phillips*, 27

Ohio St.2d 294, 302 (1971)).

Petitioner attempted to present claims 41 and 43 in post-conviction proceedings;

however, the trial court explicitly refused to address the merits of these claims as barred by *res

judicata*:

> Defendant claims that witness Colin Reedy perjured himself. There is no question that Reedy was important to the case, as he testified for the State that he provided the Defendant with a 9mm handgun which is the type of weapon used to murder the victim. The Defendant argues Reedy committed perjury by testifying that he sent two text messages when in fact he sent three. This information was available at the time of the trial and could have been used for whatever probative value it might have had.

> Under the doctrine of *res judicata*, "an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue, as to the parties and their privies[.]" . . . As Defendant could have utilized such information to argue perjury at trial and chose not to do so, Defendant cannot seek to do so now. Therefore, this claim is barred by *res judicata*.

> The same is true as to Defendant's claims concerning Reedy's proffered testimony, regarding whether his phone number was operative or not and that the State used false testimony by Reedy. Further, except for the Defendant's own self-serving allegations/conclusions, no evidence has been provided to support the same.

(Doc. 12-3, PAGEID #: 1014–15.)

With respect to the second *Maupin* factor, Ohio courts have consistently refused, in

reliance on the doctrine of *res judicata*, to review the merits of procedurally barred claims. *See,

e.g.*, *State v. Cole*, 2 Ohio St.3d 112 (1982). Further, the Sixth Circuit has held that Ohio's

doctrine of *res judicata* is an independent and adequate ground for denying federal habeas relief.

*See, e.g.*, *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d

417, 427–29 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000*); Byrd v. Collins*, 209 F.3d 486, 521–22 (6th Cir. 2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998). Accordingly, the Court is satisfied from its own review of relevant case law that the *res judicata* rule articulated in *Perry* is an adequate and independent ground for denying relief, and that claims 1, 7–18, 22, 23, 25, 26, 28–32, 34–39, 41, and 43–49 are subject to procedural default.

### 2. Failure to File Timely Post-Conviction Appeal (Claim 42)

In claim 42, Petitioner asserts that he was denied the effective assistance of trial counsel, because his attorney failed to examine Reedy's phone records, which showed that Reedy sent three text messages to 267-210-4400. (Doc. 1, PAGEID #: 48). According to the Petitioner, he did not receive Reedy's messages, because this was not his phone number. Petitioner raised this same argument in his petition for post-conviction relief. The trial court rejected the claim on the merits:

> Defendant argues that counsel failed to get phone records showing that text messages from Reedy may not have been received. This argument is completely without merit. On cross-examination by defense counsel, the State's witness admitted that the phone records do not demonstrate receipt of the same.

(Doc. 12-3, PAGEID #: 1016).

Nonetheless, Petitioner failed to file a timely appeal, and the appellate court denied his motion for a delayed appeal for failure to provide an adequate explanation for his untimely filing. (PAGEID #: 1045).[3] Petitioner has thereby procedurally defaulted this claim for review in these proceedings. The Court of Appeals' decision denying the motion for a delayed appeal under Ohio Appellate Rule 5(A) constitutes an adequate and independent state procedural ground under

---

[3] The appellate court denied Petitioner's two prior motions for a delayed appeal for failure to comply with App.R. 5(A), which requires the filing of a notice of appeal with the motion for a delayed appeal. (*See* Doc. 12-3, PAGEID #: 1023; 1029).

*Maupin* to deny federal habeas corpus review.  *See Kostenbauder v. Cook*, No. 3:12-cv-2581, 2014 WL 992022, at *7 (N.D. Ohio March 13, 2014) (citing *Stone v. Moore*, 644 F.3d 342, 348 (6th Cir. 2011).

### *3. Failure to Raise Claims in the Ohio Supreme Court (Claims 5 and 33)*

In claim 5, Petitioner asserts that the evidence is constitutionally insufficient to sustain his conviction on aggravated murder.  (Doc. 1, PAGEID #: 15).  Respondent contends that Petitioner has procedurally defaulted this claim by failing to present the same issue to the Ohio Court of Appeals, where he argued that his conviction was against the manifest weight of the evidence.  (Doc. 13, PAGEID #: 1223); *Teitelbaum*, 67 N.E.3d at 115–16.  However, the United States Court of Appeals for the Sixth Circuit has held that a petitioner preserves a claim of insufficiency for federal habeas corpus review even if he raises it solely in the context of a claim that the conviction is against the manifest weight of the evidence.  *See Nash v. Eberlin*, 258 F. App'x 761, 764–65 (6th Cir. 2007).  This is so because "the determination by the Ohio Court of Appeals that the conviction was supported by the manifest weight of the evidence necessarily implies a finding that there was sufficient evidence."  *Id.* at 765.

Still, Petitioner has procedurally defaulted claim 5 because he failed to raise this same issue on appeal to the Ohio Supreme Court.  *See Hill*, 2006 WL 2807017, at *43 ("[T]he judgment of conviction on direct appeal, and any adverse decision rendered by the trial court in postconviction, must be appealed to both the Ohio Court of Appeals and the Supreme Court of Ohio").  Again, he may now no longer do so, by application of Ohio's doctrine of *res judicata*. Petitioner has thereby waived claim 5 for review in these proceedings.

Petitioner has also waived claim 33, in which he asserts the appellate court improperly required him to establish prejudice in order to establish the denial of the effective assistance of counsel, on this same basis. (*See* Doc. 12-2, PAGEID #: 800).

*4. Plain Error Review (Claims 6 and 27)*

Petitioner asserts in claim 6 that he was denied his right to a unanimous jury verdict, and in claim 27 he avers that he was denied a fair trial due to the presence and participation of alternate jurors during deliberations. (Doc. 1, PAGEID #: 16, 33). Petitioner raised these claims on direct appeal; however, the appellate court reviewed the claims for plain error only due to Petitioner's failure to raise them during trial:

> Teitelbaum's first and second assignments of error are interrelated and we address them jointly. Taken together, they assert the trial court erred in permitting an alternate juror to be present during jury deliberations.
>
> Pursuant to Crim.R. 24(G)(1), the trial court "may retain alternate jurors after the jury retires to deliberate. The court must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged. If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to being its deliberations anew." See also Crim.R. 24(G)(2) (specifically applying the rule enunciated in Crim.R. 24(G)(1) to capital cases as well).
>
> The Supreme Court of Ohio "has consistently stated that allowing alternate jurors to be present during jury deliberations is error." *State v. Downour*, 126 Ohio St.3d 508, 2010-Ohio-4503, 935 N.E.2d 828, ¶ 7, citing *State v. Murphy*, 91 Ohio St.3d 516, 531, 747 N.E.2d 765 (2001) (stating "[i]t is generally regarded as erroneous to permit alternates to sit in on jury deliberations"), and *State v. Jackson*, 92 Ohio St.3d 436, 440, 751 N.E.2d 946 (2001) (stating "[t]he trial court clearly erred * * * in allowing the alternate jurors to remain present during deliberations"). Further, in *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, the Supreme Court concluded that "reversible error occurs where, over objection, an alternate juror participates in jury deliberations resulting in an outcome adverse to a defendant and either (1) the state has not shown the error to be harmless, or (2) the trial court has not cured the error." *Gross* at ¶ 137.
>
> In *Downour*, the Supreme Court clarified the burden-shifting that occurs when a trial court permits an alternate juror to be present during jury deliberations, stating "it is the presence of the alternate jurors that shifts the burden to the state to show

that any error is harmless." (Emphasis sic.) *Downour* at ¶ 9. The Supreme Court also reiterated that "[i]n theory, the presence of alternate jurors during jury deliberations might prejudice a defendant in two different ways: either because the alternates actually participated in the deliberations, verbally or through 'body language' or because the alternates' presence exerted a 'chilling' effect on the regular jurors." *Id.*, quoting *Gross* at ¶ 135, quoting *United States v. Olano*, 507 U.S. 725, 739, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

Though Teitelbaum urges us to find presumptive reversible error from the mere presence of the alternate jurors during deliberations, we are mindful that *Downour* deals specifically with the presence of an alternate juror allowed over a defendant's objection. Here, Teitelbaum did not object to presence of the alternate jurors or to the instructions regarding the presence of the alternate jurors. Thus, as the Supreme Court reiterated in *Downour*, when a defendant does not object to the presence of an alternate juror, the court analyzes the error under a plain error analysis that does not presume prejudice. *Downour* at ¶ 7, citing *Gross* at ¶ 133, citing *Murphy* and *Jackson*. An appellate court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, 922 N.E.2d 248, ¶ 58 (10th Dist.), citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 139.

For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). We agree with Teitelbaum that the mere presence of the alternate jurors during deliberations is sufficient to satisfy the first two prongs of the plain error test. See *Downour* at ¶ 7. At issue here is whether Teitelbaum can show any prejudice from the presence of the alternate juror during deliberations.

Teitelbaum, relying on federal cases, argues that even if this court cannot presume prejudice from the mere presence of an alternate juror, we should nonetheless presume prejudice where there is evidence of actual participation by the alternate juror. *See United States v. Acevedo*, 141 F.3d 1421, 1424 (11th Cir. 1998) (concluding "that once the alternate participates in any way—whether through words or gestures—prejudice is manifest"); *Manning v. Huffman*, 269 F.3d 720, 726 (6th Cir. 2001) (stating "evidence that an alternate juror participated in jury deliberations is sufficient to demonstrate prejudice"). Though the Supreme Court has stated it will not presume prejudice, it noted in *Murphy* that the defendant could not demonstrate prejudice because, for example, there was no showing that "the alternates disobeyed the court's instructions [not to participate] by participating in the deliberations, either verbally or through body language, or that their presence chilled the deliberative process." *Murphy* at 533, 747 N.E.2d 765. *See also Jackson* at 440, 751 N.E.2d 946 (noting the defendant did not

demonstrate the alternate jurors ignored the court's instructions not to participate or otherwise affected deliberations and concluding that "although it was improper for the trial court to instruct the alternate jurors to remain present during deliberations, appellant's argument that he was denied a fair trial lacks merit"). The logical corollary, then, is that a showing that an alternate juror did actually participate in deliberations would be sufficient to demonstrate prejudice.

We recognize that the Supreme Court of Ohio has not squarely addressed the question of whether a showing of actual participation by an alternate juror is sufficient to demonstrate prejudice for purposes of a plain error analysis. Here, however, we need not determine whether the alternate juror actually participated in deliberations because even if he did, the trial court acted to remedy the situation before the jury reached a verdict. As the Supreme Court noted in *Gross*, "reversible error occurs where, over objection, an alternate juror participates in jury deliberations resulting in an outcome adverse to a defendant and either (1) the state has not shown the error to be harmless, or (2) the trial court has not cured the error." *Gross* at 154, 776 N.E.2d 1061. Though there was no objection here, the trial court recognized its error before the jury had reached a verdict; at that point, the trial court stopped deliberations, removed the alternate jurors from the room, and instructed the jury to begin its deliberations anew. We conclude this is a sufficient curative instruction.

To the extent Teitelbaum argues the curative instruction was insufficient and should have offered more guidance to the jury on precisely how to start its deliberations over, Teitelbaum presents no authority to support his position. We do not find the trial court's instruction to "start your deliberations over" to be ambiguous or unclear. Because the trial court acted to correct its error before the jury reached a verdict, we conclude Teitelbaum is unable to show the outcome of his trial would have been different but for the trial court's error in allowing the alternates to be present during a portion of deliberations. Thus, because Teitelbaum cannot demonstrate prejudice, we do not find reversible error from the presence of the alternate jurors during a portion of deliberations.

Additionally, we are mindful of the doctrine of invited error. "Under the invited-error doctrine, '[a] party will not be permitted to take advantage of an error which he himself invited or induced.'" *State v. Bey*, 85 Ohio St.3d 487, 493, 709 N.E.2d 484 (1999), quoting *Hal Artz Lincoln–Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20, 502 N.E.2d 590 (1986), paragraph one of the syllabus. *See also State v. Jennings*, 10th Dist. No. 09AP–70, 2009-Ohio-6840, 2009 WL 5062117, ¶ 75, citing *State v. Bogovich*, 10th Dist. No. 07AP–774, 2008-Ohio-3100, 2008 WL 2514085, ¶ 10 (explaining the invited error doctrine precludes a claim o[f] reversible plain error).

Here, both parties agreed to the trial court's initial instructions to the jury regarding the presence of the alternate jurors in the deliberation room. Even when the court paused during instructions to clarify that both parties wanted to send the

alternates into the jury room, counsel for Teitelbaum again affirmatively agreed. Moreover, counsel for Teitelbaum never objected to the alternate jurors' presence prior to the verdict, and counsel for Teitelbaum affirmatively agreed with the court's remedy of removing the alternates and offering a curative instruction to begin deliberations anew. "'This is precisely the situation the invited error doctrine seeks to avert.'" *Jennings* at ¶ 76, quoting *State v. Doss*, 8th Dist. No. 84433, 2005-Ohio-775, 2005 WL 433531, ¶ 7, citing *United States v. Jernigan*, 341 F.3d 1273, 1290 (11th Cir. 2003) (holding a criminal defendant "may not make an affirmative, apparently strategic decision at trial and then complain on appeal that the result of that decision constitutes reversible error").

Thus, both because Teitelbaum does not demonstrate plain error from the presence of the alternate jurors during deliberations and because any error amounts to invited error, we overrule Teitelbaum's first and second assignments of error.

(Doc. 12-2, PAGEID #: 744–48, *State v. Teitelbaum*, 67 N.E.3d at 104–06).

Petitioner's claims regarding the alternate jurors (claims 6 and 27) were procedurally defaulted by his failure to make a contemporaneous-objection at the trial-court level.

Ohio's contemporaneous objection rule, set forth in *State v. Glaros*, 170 Ohio St. 471 (1960), requires the parties to preserve errors for appeal by calling them to the attention of the trial court at a time when the error could be avoided or corrected. It has been held time and again that the rule is an adequate and independent state ground of decision sufficient to justify the procedural default of a federal constitutional claim. *See, e.g.*, *Hand v. Houk*, No. 14-3148, 2017 WL 3947732, at *18 (6th Cir. Sept. 8, 2017) ("We have previously held that an Ohio court's enforcement of the contemporaneous-objection rule is an independent and adequate state ground of decision sufficient to bar habeas relief.") (internal citation omitted); *Wogenstahl v. Mitchell*, 668 F.3d 307, 335 (6th Cir. 2012) ("Failure to adhere to the firmly-established Ohio contemporaneous objection rule is an independent and adequate state ground of decision."), citing *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011) ("Ohio's contemporaneous objection rule is a firmly established procedural rule that is an adequate and independent state ground to foreclose federal relief."); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir. 2010) (same).

*Twyford v. Bradshaw*, No. 2:03-cv-906, 2017 4280955, at *19 (S.D. Ohio Sept. 27, 2017).

Although the state appellate court reviewed Petitioner's claims for plain error, this does not save a petitioner from procedural default. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir.

2006).  Instead, the Sixth Circuit has held that "[a] plain error analysis is not tantamount to a review on the merits," meaning the state appellate court's review for plain error does not imply it overlooked Petitioner's procedural default, *i.e.* his failure to object at trial.  *Scott v. Mitchell*, 209 F.3d 854, 865 (6th Cir. 2000); *see also Lundgren*, 440 F.3d at 765 (holding that plain error analysis is "viewed as a court's right to overlook procedural defects to prevent manifest injustice, but is not equivalent to a review of the merits").  Moreover, an appellate court's alternative ruling on the merits does not remove the procedural default.  *Conley*, 505 F. App'x at 506 (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998)).

Likewise, under the doctrine of invited error, Petitioner cannot raise a claim in federal habeas proceedings for an issue about which he explicitly consented in the state courts.  *See Grant v. Brigano*, No. C-1-03-896, 2007 WL 2782742, at *7 (S.D. Ohio Sept. 24, 2007).

> The Sixth Circuit in *Fields v. Bagley*, 275 F.3d 478 (6th Cir. 2001) explained the doctrine as follows:
>
>> The doctrine of "invited error" is a branch of the doctrine of waiver in which courts prevent a party from inducing an erroneous ruling and later seeking to profit from the legal consequences of having the ruling set aside. *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 61 (6th Cir. 1991). When a petitioner invites an error in the trial court, he is precluded from seeking habeas corpus relief for that error. See *Leverett v. Spears*, 877 F.2d 921, 924 (11th Cir. 1989); *Draughn v. Jabe*, 803 F.Supp. 70, 75 (E.D. Mich. 1992).
>
> 275 F.3d 478, 485-86. In accordance with this doctrine, "'[a]n attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course.'" *United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002) (quoting *United States v. Sloman*, 909 F.2d 176, 182 (6th Cir. 1990)).

*Id.*; *see also Young v. Larose*, No. 4:13-cv-220, 2015 WL 5233417, at *13 (N.D. Ohio Sept. 8, 2015) (citing *Fulcher v. Motley*, 444 F.3d 791, 798–99 (6th Cir. 2006)) (other citations omitted) (concluding that the petitioner waived claim under doctrine of invited error).

*5. Failure to Timely Appeal in Rule 26(B) Proceedings (Claims 4, 31, 50)*

In claims 4, 31, and 50, Petitioner asserts that he was denied the effective assistance of appellate counsel. (Doc. 1, PAGEID #: 8, 36–37, 57). However, Petitioner never filed a timely appeal of the appellate court's September 1, 2016 decision denying his Rule 26(B) application. He may no longer do so, as Ohio does not permit delayed appeals in Rule 26(B) proceedings. Ohio S. Ct. Prac. R. 7.01(A)(4)(c). This Court has repeatedly held that the failure to file a timely appeal to the Ohio Supreme Court in Rule 26(B) proceedings constitutes a procedural default of a claim of the denial of the effective assistance of appellate counsel. *See Davis v. Morgan*, No. 2:15-cv-00613, 2017 WL 56034, at *3 (S.D. Ohio Jan. 5, 2017) (citing *Wright v. Lazaroff*, 643 F.Supp.2d 971, 987-88, 994 (S.D. Ohio 2009); *Johnson v. Turner*, No. 2:14-cv-01908, 2016 WL 6963177, at *6 (S.D. Ohio Nov. 29, 2016); *Hudson v. Smith*, No. 2:09-cv-0030, 2010 WL 2671273, at *6 (S.D. Ohio June 30, 2010)). Thus, these claims are procedurally defaulted as well.

### C. Petitioner's Procedural Default Cannot Be Excused

*1. Cause and Prejudice*

Petitioner may still secure review of his claims on the merits if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the constitutional violations that he alleges. As cause for his procedural default, Petitioner alleges that his attorney was colluding with the prosecution (claim 46), thereby denying him the effective assistance of trial counsel. Additionally, Petitioner asserts that he was denied the effective assistance of appellate counsel (claim 50). According to Petitioner, he could not present all of his claims on appeal, because the state appellate court limited his appellate brief to 65 pages. (Doc. 15, PAGEID #: 5323).

"[P]etitioner has the burden of showing cause and prejudice to overcome a procedural default." *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001) (citing *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (internal citation omitted)). A petitioner's *pro se* status, ignorance of the law, or ignorance of procedural requirements are insufficient bases to excuse a procedural default. *Bonilla*, 370 F.3d 498. Instead, in order to establish cause, a petitioner "must present a substantial reason that is external to himself and cannot be fairly attributed to him." *Hartman v. Bagley*, 492 F.3d 347, 358 (6th Cir. 2007).

Petitioner has failed to meet this standard here. As discussed, he has waived his claim of the denial of the effective assistance of appellate counsel by failing to file a timely appeal in Rule 26(B) proceedings. He likewise has waived his claim of the denial of the effective assistance of trial counsel based on his attorney's alleged collusion with the prosecution by failing to present this claim to the state courts. Thus, neither of the foregoing claims can serve as "cause" for his procedural defaults. *Edwards*, 529 U.S. at 452 ("A claim of ineffective assistance . . . generally must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." (internal quotations and citations omitted). Further, the record does not support Petitioner's allegation that he could not raise his claims on direct appeal due to page limitations on the filing of his appellate brief. As this Court has previously held, there is a difference between not "fully briefing each assignment of error," and not mentioning it at all. *See Hill*, 2006 WL 2807017, at *68. Consequently, the undersigned finds that Petitioner has failed to demonstrate cause for his procedural default.

### 2. Actual Innocence

In claims 1 and 40, Petitioner asserts that he is actually innocent and that newly discovered flaws in the FBI's DNA database render the testimony of the prosecution's DNA

expert unreliable, resulting in a manifest miscarriage of justice.  Petitioner refers to a May 31, 2015, article in the Washington Post regarding errors in data used by forensic scientists in matching DNA evidence, and an excerpt from the Journal of Forensic Sciences in 2015, in support.  (*See* Doc. 1-2, 1-3).  Petitioner also argues that evidence showed that he had left the area of the Gateway apartment complex by 9:15 p.m., and therefore could not have killed Horn, as charged.  (Doc. 1-1, PAGEID #: 76–77).  Petitioner further complains that the state appellate court failed to recognize the strength of his alibi defense and ignored evidence indicating that he could not have been present at the time of death.  Reply (Doc. 15, PAGEID #: 5330–31).

A free-standing claim of actual innocence does not provide a basis for federal habeas relief absent a separate constitutional violation.  *See Legrone v. Birkett*, 571 F. App'x 417, 421 (6th Cir. 2014) (citing *Herrera v. Collins*, 506 U.S. 390, 400 (1993)).  However, the United States Supreme Court has also held that a claim of actual innocence may be raised "to avoid a procedural bar to the consideration of the merits of [a petitioner's] constitutional claims."  *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995).  "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."  *Murray*, 477 U.S. at 496.  In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to authorize a federal court in reaching the merits of an otherwise procedurally-barred habeas petition.  *Id*. at 317.  However, a claim of actual innocence is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'"  *Id*. at 315 (quoting *Herrera*, 506 U.S. at 404).

The actual innocence exception to procedural default allows a petitioner to pursue his constitutional claims if it is "more likely than not" that new evidence—*i.e.*, evidence not previously presented at trial—would allow no reasonable juror to find him guilty beyond a reasonable doubt. *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005). The Court of Appeals for the Sixth Circuit has explained this exception as follows:

> The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316, 115 S.Ct. 851, 130 L.Ed.2d 808. Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id*. at 317, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id*. at 321, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808.

*Souter*, 395 F.3d at 589–90 (footnote omitted).

Petitioner cannot meet these high standards here. Indeed, the appellate court provided a detailed account of the circumstantial evidence against Petitioner:

> Here, there was ample circumstantial evidence that Teitelbaum planned and carried out Horn's murder. Teitelbaum was in a contentious legal battle with Horn, and his journal entries showed a preoccupation with his hatred for Horn. The forensic evidence established Horn died from bullets fired from a 9 mm handgun, the same type of gun Reedy supplied to Teitelbaum. The GPS and cell-tower data showed Teitelbaum had the opportunity to carry out the crime, traveling from his home in New Jersey all the way to Columbus, waiting at the end of Thrailkill Road that evening until a time corresponding with when Horn left the Platinum Players Club. DNA testing indicated that DNA found inside the

doorknob of Horn's apartment was consistent with Teitelbaum, even though it was not as precise of a match as is sometimes possible with DNA testing. Additionally, surveillance footage showed Teitelbaum disposing of items into the water off the Main Street bridge late in the evening the night Horn was shot, buying a change of clothes at Walmart, and appearing to do something to the license plates on his car. The evidence showed Teitelbaum had grown a beard in the months leading up to Horn's death but shaved it off immediately afterward. And finally, the testimony that a border patrol agent caught Teitelbaum attempting to cross the border into Canada as law enforcement continued their investigation into him suggested Teitelbaum was trying to flee the country to avoid prosecution.

(Doc. 12-2, PAGEID #: 760–61, *State v. Teitelbaum*, 67 N.E. 3d at 115).

Thus, After an independent review of the record, the Court does not deem this to be so extraordinary a case as to relieve petitioner of his procedural default. Accordingly, Petitioner has waived all of the claims he now presents for review, with the exception of claims 2, 3, 19–21, and 24. The Court will now address the merits of those claims.

## III. MERITS

### A. Standard of Review

Because Petitioner seeks habeas relief under 28 U.S.C. § 2254, the Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this case. The United State Supreme Court has described the AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted)).

AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Further, the factual findings of the state court are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Accordingly, "a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)). The United States Court of Appeals for the Sixth Circuit has summarized these high standards:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or either unreasonably extends or unreasonably refuses to

extend a legal principle from Supreme Court precedent to a new context. *Id.* at
407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Id.* at 748–49. Ultimately, the burden of satisfying AEDPA's standards rests with the petitioner.

*See Cullen v. Pinholster*, 563 U.S.170, 181 (2011).

### B. Evidentiary Rulings (Claims 19-21)

In claims 19–21, Petitioner challenges the trial court's evidentiary rulings regarding the
admissibility of e-mails exchanged between Petitioner and prosecution witness Colin Reedy.
(Doc. 1, PAGEID #: 27–29). Law enforcement had received copies of the emails from
Petitioner's ex-wife, Deborah Davis, who had obtained the e-mails from Petitioner's Yahoo e-
mail account. (*See* Doc. 12-1, PAGEID #: 366; Doc. 14-1, PAGEID #: 1884, 1948–51). At trial,
defense counsel objected to Davis providing any testimony regarding the emails, which the trial
court sustained. (Doc. 14-1, PAGEID #: 3335; 3366–67; 3401–03). Defense counsel also
objected to the admission of the e-mails in general or testimony by Reedy regarding the content
of his e-mail exchanges with the Petitioner. (PAGEID #: 3404–05; 3667). The trial court
overruled that objection, however, and Reedy testified that the e-mails were part of his ongoing
conversation with Petitioner about obtaining a gun and Petitioner's plans for killing Paul Horn.
(PAGEID #: 3669–78).

Petitioner argues that the trial court abused its discretion in permitting admission of this
evidence and that he was thereby denied a fair trial. The state appellate court rejected these
claims:

> Teitelbaum argues the trial court abused its discretion in making several
> evidentiary rulings. More specifically, Teitelbaum challenges the trial court's
> rulings regarding the admissibility and authentication of the emails Teitelbaum's
> ex-wife obtained from his email account. Generally, the admission or exclusion of
> evidence lies in the sound discretion of the trial court. *State v. Darazim*, 10th Dist.
> No. 14AP–203, 2014-Ohio-5304, 2014 WL 6726318, ¶ 33, citing *State v.*

Bartolomeo, 10th Dist. No. 08AP–969, 2009-Ohio-3086, 2009 WL 1819507, ¶ 24.

At trial, the state sought to introduce the printouts of the emails between Reedy and Teitelbaum. The state proffered what Davis's testimony would be regarding how she obtained the emails by accessing Teitelbaum's email account without his knowledge using his password, printed out portions of the emails, and mailed them anonymously to the Grove City police, but Teitelbaum objected to Davis providing any testimony regarding the emails. The trial court sustained the objection, ruling Davis could "not talk about these e-mails in any way." (Tr. Vol. X at 1918.) Later, when Reedy testified, the trial court permitted Reedy to authenticate the printouts of the emails over Teitelbaum's objection. On appeal, Teitelbaum argues these evidentiary rulings are inconsistent.

A. Authentication

Initially, Teitelbaum argues the trial court abused its discretion in permitting Reedy to authenticate the printouts of the emails because it was Davis, not Reedy, who accessed the emails and copied them into Word documents before printing them out. Thus, Teitelbaum argues Reedy lacked the requisite personal knowledge to authenticate the emails. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). Further, testimony of a witness with knowledge "that a matter is what it is claimed to be" is one way of establishing authenticity. Evid.R. 901(B)(1). Here, Reedy testified that the print-outs of the emails were authentic copies of the emails he had exchanged with Teitelbaum, and he provided further testimony regarding what the emails said and their timing in relation to Teitelbaum's plot to kill Horn. As one of the parties to the emails, Reedy was a witness with knowledge as required by Evid.R. 901, and his testimony was sufficient to authenticate the emails. *See State v. Bell*, 12th Dist. No. CA2008–05–044, 2009-Ohio-2335, 2009 WL 1395857, ¶ 31 (testimony of one of the parties to a series of emails and online conversations was sufficient to authenticate printouts of the emails and online conversations). Thus, we find no abuse of discretion in the trial court concluding Reedy's testimony sufficiently authenticated the printouts of the emails.

B. Unfair Prejudice

Next, Teitelbaum argues the trial court abused its discretion in admitting the emails into evidence because of the danger of unfair prejudice under Evid.R. 403(A).

Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

There is no dispute here that the emails between Reedy and Teitelbaum constitute relevant evidence. However, Teitelbaum argues the emails are unfairly prejudicial. Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

Teitelbaum seems to argue that because the emails tend to support a guilty verdict, they are therefore unfairly prejudicial. However, "[i]f unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word 'unfair.'" *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 24, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001). Thus, "'[u]nfair prejudice is that quality of evidence which might result in an improper basis for a jury decision.'" *Id.*, quoting *Oberlin* at 172, 743 N.E.2d 890. Evidence may be unfairly prejudicial if it "'arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish.'" *Id.*, quoting *Oberlin* at 172, 743 N.E.2d 890. Often, though not always, evidence is unfairly prejudicial if it appeals to the jury's emotions rather than the jury's intellect. *Id.*

Fairness is subjective and thus the determination whether evidence is unfairly prejudicial is left to the sound discretion of the trial court. *Crotts* at ¶ 25, citing *State v. Robb*, 88 Ohio St.3d 59, 68, 723 N.E.2d 1019 (2000). We find no abuse of discretion in the trial court's conclusion that the contents of these emails do not appeal to the jury's emotions, evoke a sense of horror, or appeal to an instinct to punish. Instead, we agree with the state that the emails aided the jury in evaluating Reedy's credibility regarding his version of how the murder plot unfolded.

C. Cumulative Evidence

Teitelbaum also argues the emails were needlessly cumulative because Reedy was available to, and did in fact, testify. Evid.R. 403(B) provides that relevant evidence is not admissible if its probative value is substantially outweighed by consideration of undue delay or needless presentation of cumulative evidence. However, "Evid.R. 403(B) does not require exclusion of cumulative evidence. The court has discretion to admit or exclude it." *State v. Campbell*, 69 Ohio St.3d 38, 51, 630 N.E.2d 339 (1994). Cumulative evidence "is additional evidence of the same kind to the same point." *Smith v. Chatwood*, 2d Dist. No. 2618, 1990 WL 119270 (Aug. 15, 1990), citing *Kroger v. Ryan*, 83 Ohio St. 299, 94 N.E. 428 (1911), paragraph one of the syllabus.

We do not agree with Teitelbaum that the emails were needlessly cumulative to Reedy's testimony. The emails served, along with Reedy's testimony, to establish a timeline of Teitelbaum's plot to kill Horn. Additionally, since Reedy admittedly testified pursuant to a joint agreement with the state and federal prosecutors, the emails served to help the jury assess his credibility. Thus, the emails were not

needlessly cumulative and the trial court did not abuse its discretion in admitting the emails over Teitelbaum's objection.

D. Contradictory Rulings

Finally under this assignment of error, Teitelbaum argues the trial court's evidentiary rulings regarding the emails were contradictory. More specifically, Teitelbaum argues that because the trial court allowed Reedy to discuss the emails but did not allow Davis to testify regarding how she obtained the emails, the jury was not allowed to hear important information that would help it decide how much weight to place on the contents of the emails.

When the state attempted to have Davis testify about the emails, Teitelbaum objected, and the trial court sustained his objection. Despite his successful objection at trial, Teitelbaum argues on appeal that the trial court should have permitted Davis to testify to a limited extent regarding how she accessed Teitelbaum's email account and copied the contents of certain emails into Word documents. Even if we were to somehow construe the trial court sustaining Teitelbaum's objection as error, it would be invited error. As we explained in our resolution of Teitelbaum's first and second assignments of error, the invited error doctrine precludes a defendant from making a strategic decision at trial and then complaining on appeal that the result of that decision constitutes reversible error. *Jennings* at ¶ 76, citing *Doss* at ¶ 7. *See also Murphy* at 535, 747 N.E.2d 765 ("a litigant may not 'take advantage of an error which he himself invited or induced'").

In sum, the trial court did not abuse its discretion in making its evidentiary rulings regarding the printouts of the emails between Reedy and Teitelbaum. Reedy's testimony provided a sufficient basis to authenticate the emails, the emails were neither unfairly prejudicial nor needlessly cumulative, and any error in the trial court not permitting Davis to testify regarding the emails was invited error. Accordingly, we overrule Teitelbaum's fourth assignment of error.

*State v. Teitelbaum*, 67 N.E.3d at 107–10.

As a general matter, errors of state law, especially the improper admission of evidence, do not support a writ of habeas corpus. *See Estelle v. McGuire*, 502 U.S. 62 (1991); *see also Giles v. Schotten*, 449 F.3d 698, 704 (6th Cir. 2006) ("State court evidentiary rulings do not rise to the level of due process violations unless they 'offend ... some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'") (quoting *Coleman*, 268 F.3d at 439 (6th Cir. 2001). Instead, to be entitled to habeas relief, a petitioner must show

that the evidentiary ruling was "so egregious that it resulted in a denial of fundamental fairness." *Giles*, 449 F.3d at 704 (citing *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004)). Stated differently, "'[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial.'" *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2006) (citing *Roe v. Baker*, 316 F.3d 557, 567 (6th Cir. 2002)).

In light of this very deferential standard, the undersigned finds that Petitioner cannot show habeas relief is warranted. For the reasons addressed by the state appellate court, the undersigned cannot conclude that the state-court rulings regarding admissibility of e-mail evidence was so egregious as to have resulted in a denial of fundamental fairness. The Court therefore rejects Petitioner's argument on these claims. *See Giles*, 449 F.3d at 704 (holding that a state court evidentiary ruling does not violate due process unless it "'offend[s] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,'" and, as such, Petitioner's due process rights were not violated) (quoting *Coleman*, 268 F.3d at 439). Consequently, claims 19–21 are without merit.

### C. Ineffective Assistance of Trial Counsel (Claims 2, 3, 24)

In claim 2, Petitioner asserts that he was denied the effective assistance of trial counsel because his attorney failed to properly develop arguments regarding the time of death. (Doc. 1, PAGEID #: 10). Petitioner also asserts in claim 3 that his attorney's "failure to properly instruct the jury regarding the time of [] death" amounted to constitutionally ineffective assistance. (*Id.*, PAGEID #: 12). Petitioner argues that evidence established that Horn was killed after midnight, and that Petitioner left the area before 9:15 p.m., and therefore could not have been the killer. (Doc. No. 1-1, PAGEID #: 81). The state appellate court rejected this claim as follows:

Teitelbaum argues he was deprived of his constitutional right to the effective assistance of counsel. In order to prevail on a claim of ineffective assistance of counsel, Teitelbaum must satisfy a two-prong test. First, he must demonstrate that his counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This first prong requires Teitelbaum to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. If Teitelbaum can so demonstrate, he must then establish that he was prejudiced by the deficient performance. *Id*. To show prejudice, Teitelbaum must establish there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial. *Id*. at 694, 104 S.Ct. 2052.

In considering claims of ineffective assistance of counsel, courts indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101. . . .

Teitelbaum [] argues his trial counsel was ineffective in failing to develop an argument regarding the time of Horn's death. However, Teitelbaum does not elaborate as to what that argument could or should have been, nor does Teitelbaum explain what prejudice, if any, resulted from his counsel's failure to make such a vague argument. Accordingly, we find trial counsel's choice not to pursue an argument regarding Horn's time of death does not amount to ineffective assistance of counsel.

*State v. Teitelbaum*, 67 N.E. 3d at 111–14.

In all criminal prosecutions, the Sixth Amendment affords "the accused . . . the right . . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court has cautioned federal habeas courts to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Indeed, the Supreme Court observed that while "'[s]urmounting *Strickland's* high bar is never ... easy[,]' . . . [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is even more difficult[.]" *Id*. (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)

45

and citing *Strickland*, 466 U.S. at 689). The Supreme Court instructed that the standards created under *Strickland* and § 2254(d) are both "'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (citations omitted). Thus, when a federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "[t]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

Petitioner argues that his attorney failed to contradict the State's timeline as to the time of death. (Doc. 15, PAGEID #: 5331). However, in opening statement, defense counsel argued that GPS evidence would show that Petitioner had left the area before Horn was killed:

> One of the things we really want you to focus on is time. You're going to be given GPS tracking records. You're going to be given phone records. You're going to be given layouts and maps and timing. What's very crucial is timing.
>
> What they cannot prove beyond a reasonable doubt is that Dan Teitelbaum was anywhere near that apartment when Paul Horn was. I'll say it again. They cannot prove that Dan Teitelbaum was anywhere near that apartment when Paul Horn was. So please focus on that as you're taking your notes.

(Doc. 14-1, PAGEID #: 2531). In closing, counsel repeated the argument:

> [T]hey can't put him near that address. They can't put him near his home at that time. We don't know when Paul Horn was killed. We don't know when forensically he was killed. Dr. Gorniak can only establish when the EMTs pronounced him dead.
>
> We've heard some lay testimony and some expert testimony about the drying of blood and things of that nature. Nothing was tested. We didn't hear anything about body temperature. We didn't hear anything about any specifics on lividity and how the body may have been laying to determine that. It took us to try to track down witnesses, one from California, one another Missy Tucker that was very difficult to track down, who came in and testified under oath. . . .
>
> And Mr. Borrayo heard some thumps. But what's important is he heard them between 12:00 and 2:00 or 12:00 and 3:00. . . . More importantly is that [he is] corroborated by Missy Tucker who also lives in the same building. And she heard popping noises and what sounded like a body hitting the floor between 11:00 and 2:00, I believe was her timeframe.

> . . . [W]hat we know of from the evidence is that Dan Teitelbaum is at Jimmy Neace's house. Dan Teitelbaum isn't anywhere near Gateway Lakes Drive.

(PAGEID #: 4930–32). Counsel argued that evidence established that Horn was away from his home as late as 9:04 p.m., and it therefore would have been impossible for Petitioner to have killed Horn. (PAGEID #: 4947). As the state court correctly noted, Petitioner does not indicate, nor does the record reflect, that his attorney could have presented any additional evidence or made any further argument on this aspect of Petitioner's theory. Petitioner therefore has failed to establish the denial of the effective assistance of counsel on this basis.

Petitioner also asserts in claim 24 that he was denied the effective assistance of counsel because his attorney failed to file a pre-trial motion to suppress admission of the e-mail evidence. (Doc. 1, PAGEID #: 31). The state appellate court rejected this claim as follows:

> Teitelbaum argues his trial counsel was ineffective in failing to file a motion to suppress the emails. At trial, the state proffered that Davis would testify she obtained the emails by accessing Teitelbaum's email account without his knowledge using his password, copied the contents of the emails into another document, printed them in such a way to remove any identifying information that would link her to the emails, and anonymously mailed the copies of the emails to the Grove City Division of Police. Teitelbaum argues Davis's actions in acquiring the emails in this manner constitutes a violation of R.C. 2933.62(A) and/or Title I of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. 2510 et seq., and he argues his trial counsel should have moved to suppress the emails on these grounds.

> "In order to prevail on a claim of ineffective assistance of counsel in a case involving a failure to make a motion on behalf of a defendant, the defendant must show '(1) that the motion * * * thereto was meritorious, and (2) that there was a reasonable probability that the verdict would have been different had the motion been made.'" *State v. Peterson*, 10th Dist. No. 07AP–303, 2008-Ohio-2838, 2008 WL 2390781, ¶ 55, quoting *State v. Lawhorn*, 3d Dist. No. 11–04–19, 2005-Ohio-2776, 2005 WL 1323111, ¶ 35.

> Teitelbaum goes to great lengths to attempt to fit Davis's actions in accessing Teitelbaum's email account using his password into a violation of either R.C. 2933.62 or the ECPA. However, even if we were somehow persuaded that a motion to suppress filed on this basis would have been successful, Teitelbaum

47

cannot show any reasonable probability that the outcome of the trial would have been different.

To the extent Teitelbaum suggests police would not have investigated him at all were it not for the receipt of the copies of the emails, the record undermines his argument. Detective Forney testified Teitelbaum was a suspect "[f]rom day one." (Tr. Vol. XV at 3066.) Police knew of the business dispute between Horn and Teitelbaum very early on in the investigation. Additionally, police collected a DNA sample from Teitelbaum over a week before the Grove City police received the printouts of the emails. Even without the emails, the focus of the investigation was already on Teitelbaum.

Additionally, Teitelbaum does not explain how the outcome of the trial would have been different had the emails not been admitted. There was ample other evidence demonstrating Teitelbaum's motive to commit the crime as well as evidence placing him in the physical proximity of the location of the murder. Even without the email evidence, the jury had ample evidence to convict Teitelbaum. It is also possible trial counsel made the strategic choice not to file a motion to suppress but to instead object at trial in order to plant seeds of doubt regarding the strength of the state's case, especially since trial counsel's initial objection regarding the emails was successful. "Tactical or strategic trial decisions, even if ultimately unsuccessful, will not substantiate a claim of ineffective assistance of counsel." *State v. Ryan*, 10th Dist. No. 08AP–481, 2009-Ohio-3235, 2009 WL 1911863, ¶ 77, citing *In re M.E.V.*, 10th Dist. No. 08AP–1097, 2009-Ohio-2408, 2009 WL 1449021, ¶ 34.

B. Preliminary Determination of the Admissibility of the Emails

Teitelbaum argues, without citation to any relevant authority, that the best approach to determine the admissibility of evidence is through the use of the procedures outlined in Evid.R. 104, which his trial counsel did not do here. However, as we noted above, trial counsel's decision to wait to object during trial may have been a strategic decision to highlight perceived weaknesses in the state's case for the jury. Additionally, because the trial court ultimately determined the emails were admissible, Teitelbaum does not demonstrate any prejudice from his counsel's failure to move for a preliminary determination of the admissibility of the evidence. Thus, trial counsel was not ineffective in this regard.

*State v. Teitelbaum*, 67 N.E.3d at 112–13.

Petitioner maintains that the trial court ruled that the e-mails were admissible only after improper *ex parte* communications between the prosecution and the trial court during a lunch break, which violated his right to a fair and public trial, and could have been avoided had his

attorney filed a pre-trial motion to suppress. (Doc. 15, PAGEID #: 5340). This allegation, however, is without support and does not appear to have been presented to the state courts. Moreover, even had counsel succeeded in preventing the admission of the e-mails themselves, such evidence was cumulative to Reedy's testimony, and thus there remained ample evidence to convict Petitioner. Thus, Petitioner has failed to establish the denial of the effective assistance of counsel as to claim 24.

Petitioner likewise has failed, under AEDPA, to establish that the state appellate court unreasonably applied or contravened *Strickland*, or based its decision on an unreasonable determination of the facts in the light of the evidence presented so as to warrant federal habeas corpus relief. Consequently, claims 2, 3, and 24 are without merit.

## IV. RECOMMENDED DISPOSITION

For the foregoing reasons, it is **RECOMMENDED** that the Petition be **DENIED** and that this action be **DISMISSED**.

### Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation.  See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

IT IS SO ORDERED.


Date:  May 2, 2018                                   /s/ Kimberly A. Jolson
                                                     KIMBERLY A. JOLSON
                                                     UNITED STATES MAGISTRATE JUDGE